**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANTUAN LENIERE JONES, JR.,<br>**Plaintiff,**<br><br>v.<br><br>CAROLYN W. COLVIN,<br>**Acting Commissioner of**<br>**Social Security,**<br>**Defendant.** | )<br>)<br>)<br>)  **2:15-cv-01169-TFM**<br>)<br>)<br>)<br>)<br>)<br>) |

<u>**MEMORANDUM OPINION**</u>

February 25, 2016

**I.      Introduction**

Plaintiff,  Antuan Leniere Jones, Jr., filed this action pursuant to 42 U.S.C. § 405(g),

seeking judicial review of the final decision of the Acting Commissioner of Social Security,

which denied his claim for supplemental security income ("SSI") under Title XVI of the Social

Security Act. Pending before the court are the Cross-Motions for Summary Judgment filed by

Plaintiff and the Acting Commissioner. (ECF Nos. 6, 15). Both parties have filed briefs in

support of their motions, (ECF Nos. 7, 16), which, accordingly, are ripe for disposition.

**II.      Background**

Plaintiff was born on October 22, 1994. (R. 47). He is a high school graduate, with no

past relevant work experience. He applied for SSI on July 24, 2012, when he was under 18 years

old. Plaintiff's claim was denied at the initial level of review, so he requested a hearing, which

was held on February 20, 2014, before Administrative Law Judge ("ALJ") Guy Koster. Plaintiff

testified at the hearing, as did his grandmother, with whom he was living at the time, and a

vocational expert. The ALJ issued an unfavorable decision to Plaintiff on March 28, 2014, and

the Appeals Council denied Plaintiff's request for review on July 15, 2015, thereby making the

ALJ's decision the final decision of the Acting Commissioner. This action followed.

## A. Medical Treatment History

Plaintiff started to exhibit disruptive and erratic behavior during his junior year of high school. In May 2011, following an incident in which he entered an abandoned building without authorization and was found to be in possession of a small amount of marijuana, he was adjudicated delinquent and placed on probation. (R. 259). In July 2011, he was placed in Shuman Juvenile Detention Center for violating his probation. (R. 259).

As a result of his mental health problems, on September 2, 2011, Plaintiff was referred to the Bradley Center, a residential mental health treatment facility. (R. 259). He was noted to have displayed anger and depression over the past few months, and, at intake, he carried diagnoses of "[major depressive disorder] recurrent moderate severity with possible psychotic symptoms, history of cannabis and alcohol abuse and features of conduct disorder, also schizoid personality trait with aggressive and negativistic features." (R. 259) During an intake examination with Dr. Craig Martin, Plaintiff's family members reported that they had grown increasingly concerned about his depression. (R. 260). During that time, he had become socially withdrawn and irritable with decreased energy and self-worth and had been suspended from school once for fighting, even though he historically not been angry or aggressive. (R. 259). He also displayed a lack of interest in activities he had formerly enjoyed, had trouble sleeping, and displayed poor hygiene. (R. 259). Furthermore, he had suicidal ideation. (R. 260). A mental status exam revealed intact speech and goal-directed thought, but Plaintiff did appear hesitant and guarded. (R. 261). He denied hallucinations, delusions, suicidal/homicidal ideation, and having the urge to harm himself. (R. 261). Based on the exam, Dr. Martin found that Plaintiff's "diagnoses appear to be most consistent with depressive disorder NOS, history of cannabis and alcohol abuse [and] R/O

conduct disorder." (R. 261). Plaintiff was prescribed Abilify and an individualized treatment plan was prepared. (R. 294).

In preparation for his discharge from Bradley Center, Plaintiff underwent a clinical evaluation for wraparound services at Mercy Behavioral Health Systems on February 9, 2012. (R. 338). It was noted that he had recently been diagnosed with schizoaffective disorder, the symptoms of which were exacerbated when he failed to take his medications as prescribed. (R. 338). It was further noted that Plaintiff's change in behavior in May 2011 "was thought to be associated with abuse of marijuana and alcohol." (R. 338). "While at Bradley Center," though, "it was determined that this was not the case as anti-psychotic medication stabilized his mood and behavior" and improved his "thought processes." (R. 338). When not taking his medication, however, Plaintiff displayed "paranoid ideation, disturbance of thought processes, and depression." (R. 338).

Plaintiff was discharged from the Bradley Center the next day. (R. 251). Upon his discharge, his diagnoses were "schizoaffective disorder, most recent episode depression with psychosis," and "R/O polysubstance abuse," and he was assessed a GAF of 60. (R. 251). Upon his discharge, he was prescribed with Abilify and Prozac. (R. 251). Moreover, he was referred for wraparound services and substance-abuse counseling. (R. 338). He was also advised to follow-up with Dr. Katrijn Wilson, a psychiatrist at Mercy Behavioral Health. (R. 338).

Plaintiff met with Dr. Wilson for the first time on March 5, 2012. (R. 519). Plaintiff's father, who was present for the intake interview, explained that his behavior had changed distinctly in May 2011; he had started to act "more bizarre" and displayed paranoia. (R. 519). Prior to that point, Plaintiff's father described him as "a mild mannered young man with no issues and no oppositional symptoms." (R. 519). According to the records, Plaintiff had also

endorsed hallucinations in the past, but he told Dr. Wilson that this had been a misunderstanding. (R. 519). During the evaluation with Dr. Wilson, Plaintiff was guarded about his symptoms and would not discuss them openly. (R. 519). He did admit that he had been using marijuana since he was 14; he also admitted to smoking cigarettes and drinking alcohol, though he said he only drank "a number of times and ha[d] never been intoxicated." (R. 520). Upon examination, Plaintiff's mood appeared to be good with a constricted affect; his thought process was linear and goal-directed; he denied suicidal/homicidal ideation; he had fair judgment and insight; and he was alert and well oriented. (R. 520). On the other hand, he did appear to have some disruption in his thought pattern and possible thought blocking. (R. 520). He was diagnosed with "schizoaffective disorder," "marijuana abuse versus dependence," and "r/o alcohol abuse" and assessed a GAF of 55. (R. 521). Furthermore, he was instructed "to continue mobile therapy and substance abuse counseling." (R. 521). It was noted that Plaintiff's "resistance to therapy may be due to his current thought content and difficulty in cognitive processing." (R. 521).

Plaintiff returned to Dr. Wilson's office one month later for a follow-up. (R. 398). His father reported that his mood had stayed consistent since his last visit. (R. 398). On exam, Plaintiff's mood was good, his thought process was linear and goal-directed, his judgment and insight were fair, and he did not endorse any perceptual disturbances. (R. 398).

Plaintiff was seen by Wanda Davis, LPC, on July 6, 2012, at which time both he and his grandmother reported that his mood had been stable with no angry outbursts or irritability since his last visit. (R. 386). Plaintiff also denied experiencing any hallucinations. (R. 386). Once again, his mental status examination was largely normal, though his mood was reserved and he seemed hesitant to answer some of LPC Davis' questions. (R. 386).

When Plaintiff was next seen by Dr. Wilson on August 2, 2012, his mood was reportedly

stable, but he appeared somewhat irritable. (R. 383). Dr. Wilson noted that Plaintiff had recently graduated from high school and was looking into attending technical school. (R. 383).

On November 1, 2012, Plaintiff underwent a psychological evaluation with Dr. Pam Fabry at Mercy Behavioral Health to determine whether he was eligible for wraparound services, which he had received between March and May 2012, but which had ceased when he lost his health insurance. (R. 497-98, 502). Plaintiff's mother and grandmother wanted him to start undergoing mobile therapy again because they thought it could help him get a job or go back to school, as therapy had helped in the past. (R. 497). Indeed, it was to the point that his grandmother was not going to allow him to live with her anymore if he did not find something to do with his life. (R. 503). During the interview, Plaintiff denied that he needed wraparound services and disagreed with some of the concerns of his mother and grandmother, saying that he wasn't interested in work and was satisfied with his life. (R. 505). In particular, Plaintiff denied any psychotic symptoms. (R. 499). It was noted, however, that Plaintiff appeared to be experiencing some "negative symptoms in light of his restricted affect, lack of motivation and limited communication with family members." (R. 505). He also appeared somewhat depressed. (R. 503). Dr. Fabry administered the Child and Adolescent Functioning Assessment, the results of which showed that Plaintiff could "be treated on an outpatient basis provided risk beavhiors are not present." (R. 504). Instead of mobile therapy, Dr. Fabry recommended two other services, namely service coordination to help Plaintiff navigate community-based programs, and Services for the Treatment of Early Psychoses ("STEP") outpatient program at Western Psychiatric Institute. (R. 505). Dr. Fabry also noted that, "[i]n light of [Plaintiff's] diagnoses [of schizoaffective disorder and cannabis abuse], it is likely that [he] has some cognitive difficulties such as with attention and mental fluency that need further evaluation to best help [him] with a

career or school direction, and [Office of Vocational Rehabilitation] involvement may be helpful with career exploration." (R. 505).

On November 20, 2012, Plaintiff was evaluated by CPRP Robert Feragotti, as part of the STEP program at Western Psych, to get treatment his psychotic symptoms. (R. 453). He reported that his mood was good at the time, and he denied hallucinations or paranoia. (R. 453). Plaintiff's mother, who was present for the evaluation, noted that his medications (Abilify and Prozac) had been effective in treating his mood and psychosis. (R. 453). Upon examination, Plaintiff was diagnosed with "psychotic disorder NOS," "major depressive disorder recurrent severe w/ psychotic features," and "schizoaffective disorder." (R. 461). His GAF score was 55. (R. 461).

Later that month, Plaintiff's mother contacted LPC Davis with concerns that Plaintiff had been decompensating. (R. 483). His speech was rambling with disconnected thoughts and he had raised his hand at his grandmother. (R. 483). Moreover, Plaintiff had told his father that he believed that his family wished he was dead. (R. 483).

On December 3, 2012, Plaintiff followed up with Dr. Wilson, for what would be his last appointment at Mercy before transferring his care to Western Psych. (R. 479). Plaintiff's mental status examination was largely normal, though his behavior became guarded when discussing his psychiatric symptoms. (R. 479).

A few days later, Plaintiff attended his first therapy session with CPRP Feragotti, at which time he reported that his mood was good. (R. 444). He denied using drugs, thoughts of self-harm, suicidal/homicidal ideation, and hallucinations, and his thoughts appeared to be logical, linear, and goal-focused. (R. 444). However, his affect was restricted and his eye contact was fleeting. (R. 444). Furthermore, he reported that he continued to feel as though his grandmother was constantly watching him. (R. 444).

On December 21, 2012, Plaintiff was evaluated by Dr. Peter Murray at Western Psych after his grandmother filed a petition to have him involuntarily committed for displaying threatening behavior toward her and his father. (R. 442). Plaintiff's grandmother also reported that Plaintiff had stopped taking his medications. (R. 442). During the evaluation, Plaintiff denied experiencing any hallucinations and delusions. (R. 442). Moreover, he explained that he did not believe that he had a mental illness. (R. 442). Following the evaluation, Dr. Murray noted that there was no "compelling evidence of mood disorder or psychosis, although admittedly," Dr. Murray noted, Plaintiff "only very recently became noncompliant with Abilify and Prozac." (R. 443). Because Dr. Murray concluded that the "crisis appear[ed] to be over" and Plaintiff no longer appeared "acutely dangerous," he was cleared for discharge. (R. 443).

Plaintiff was evaluated by Dr. Shabana Khan at Western Psych on January 9, 2013, at which time Plaintiff's grandmother reported that Prozac and Abilify, which he was taking daily as prescribed, had "been effective in treating his mood had psychosis." (R. 653). (R. 653). Plaintiff denied any current symptoms of psychosis and also denied suicidal/homicidal ideation. (R. 654). Furthermore, Plaintiff told Dr. Khan that he had fabricated earlier reports of hallucinations in order to obtain an earlier release from the Shuman Center. (R. 654).

Plaintiff returned to Dr. Khan's office on March 6, 2013, and reported that he had been "doing well since his last visit." (R. 653). He had been taking his medications as prescribed and denied experiencing any adverse effects. (R. 653). He also reported that he had been taking classes at CCAC and denied any symptoms of psychosis. (R. 653). At a follow-up appointment on March 27, 2013, Plaintiff once again reported that his mood was good, though he was noted as having a low frustration tolerance at times, particularly with regard to dealing with his family. (R. 652).

At his next appointment with Dr. Khan, on April 22, 2013, Plaintiff reported that he had been experiencing paranoid ideation. (R. 530). Specifically, he said that "when his family members make certain gestures, he thinks that these gestures may have special meaning[.]" (R. 530). Plaintiff was irritable during the appointment, becoming upset with his grandmother on multiple occasions, and expressed paranoid thoughts. (R. 530). Although he denied experiencing visual hallucinations, he reported that he sometimes thought that his family members were saying things to him when they were not in fact doing so. (R. 530). Plaintiff also reported that he smoked marijuana daily. (R. 530). Dr. Khan concluded that Plaintiff's current symptomology was consistent with diagnoses of "psychotic [disorder] NOS, [rule out] cannabis abuse, and [rule out] [major depressive disorder] with psychotic features. (R. 645). Dr. Khan advised Plaintiff to stop taking Abilify and prescribed Zyprexa in its place. (R. 646).

Plaintiff's condition remained largely unchanged when he was evaluated in May and July 2013, and he continued to take Zyprexa and Prozac as prescribed. (R. 630, 636). He was, however, reportedly still smoking marijuana on a daily basis, which prompted Dr. Khan to discuss with him the "potential risks of marijuana use in terms of initiating and/or exacerbating [symptoms] of psychosis and mood [symptoms]." (R. 628).

During his appointment with Dr. Khan on August 7, 2013, Plaintiff reported that he was doing well. (R. 609). He said that he was taking his medications as prescribed, and he denied any psychotic symptoms. (R. 609). He also reported that he planned to quit smoking marijuana, although he admitted to smoking the day before his appointment. (R. 609). He also admitted to using "Molly" on a daily basis. (R. 609). According to Dr. Khan, given Plaintiff's history of substance use, there was a concern for "substance induced psychosis;" however, Plaintiff denied current psychotic symptoms. (R. 615). Dr. Khan also noted that Plaintiff would benefit from

referral to a dual diagnosis program given the extent of his drug use. (R. 620).

From August 8, 2013, through August 28, 2013, Plaintiff was involuntarily committed to Western Psych on a 302 petition filed by his mother, after he had become increasingly aggressive and displayed disorganized thinking. (R. 604). According to the 302 petition, Plaintiff had not been taking his medications "for over 2 months during which time he ha[d] severely deteriorated with increasing physical aggressiveness and bizarre and isolative behavior."[1] (R. 602). Initially, Plaintiff appeared "very disorganized, with inappropriate affect often laughing and smiling, and struggled to organize a complete thought." (R. 605). Because of these symptoms and his prior non-compliance issues, Plaintiff was given an injection of Risperdal Consta (risperidone), after which "slight improvement" in his condition was observed. (R. 604). Plaintiff was discharged on August 28, 2013, by which time his symptoms had improved, and he denied both suicidal and homicidal ideation. (R. 604). Upon discharge, Plaintiff carried a diagnosis of "schizophrenia, disorganized type (provisional)," and marijuana abuse, and he was assessed a GAF score of 45. (R. 606). Plaintiff was instructed to continue his treatment with the STEP program and prescribed Melatonin, oral Risperdal, Risperdal Consta injections (every two weeks), and Vistaril. (R. 608).

Plaintiff followed up with Dr. Khan on September 4, 2013, reporting that "things ha[d] gone great since his discharge[.]" (R. 594). He denied any hallucinations, suicidal/homicidal ideation, or paranoia. (R. 594). He also denied having smoked marijuana recently. (R. 594).

---

1.    None of the records related to Plaintiff's hospitalization refer to his August 7 appointment with Dr. Khan, at which he reported that he was taking his medications and doing well overall. These records all indicate that Plaintiff was last seen by Dr. Khan on July 8, 2013. (R. 604). It is thus not clear whether the records indicating that Plaintiff was seen by Dr. Khan on August 7 are accurate – i.e., whether Plaintiff was actually seen on that date. If so, his condition apparently deteriorated drastically between when he was seen by Dr. Khan and when he was taken to Western Psych on the 302 petition.

Nonetheless, following the exam, Dr. Khan noted that "[t]here [was] still concern about substance use." (R. 600). Indeed, Dr. Khan remarked that "[Plaintiff's] most recent psychotic symptoms may have been a substance induced psychotic episode though," he added, "this is unclear at this time." (R. 600). Upon examination, Plaintiff appeared "anxious" and "superficially pleasant and cooperative," with "poor eye contact." (R. 599). His mood appeared euthymic (i.e., normal and non-depressed) and reactive, but he displayed decreased spontaneous speech and some increase latency in his responses. (R. 599). He also displayed possible thought blocking, though his insight and judgment were considered fair. (R. 600). Dr. Khan next saw Plaintiff on September 18, 2013, at which time Plaintiff was still reportedly responding well to his medications, but there was still concern about Plaintiff's marijuana use. (R. 582, 588).

On October 16, 2013, Plaintiff reported to Dr. Khan "that things [were] 'good.'" (R. 570). He said that he would be attending school at CCAC in the spring. (R. 570). Dr. Khan remarked that Plaintiff was more "engaged" than he had been, and he appeared to be tolerating his medications. (R. 577). Furthermore, since Plaintiff had undergone five injections of the Rispderal Consta, Dr. Khan decreased Plaintiff's oral dosage of Risperdal to 5 mg daily. (R. 577). Dr. Khan also noted that there was "still concern about substance use disorder though [Plaintiff] denie[d] any recent substance use" aside from marijuana use two to four weeks prior to his appointment. (R. 577). Dr. Khan also reitireated that Plaintiff's "most recent psychotic symptoms may have been a substance induced psychotic episode though this [was] unclear at [the] time." (R. 577).

When Dr. Khan next saw Plaintiff in November 2013, he remarked that Plaintiff "appear[ed] to have decompensated" after his dosage of Risperdal was decreased. (R. 566). Plaintiff was having "significant paranoid delusions about his family" and also endorsing some

visual hallucinations. (R. 566). According to Dr. Khan, however, Plaintiff's symptoms may have also been "exacerbated by his marijuana use." (R. 566). Following this appointment, Plaintiff's dosage of Risperdal was increased from 5 mg back to 6 mg.

At a therapy session with LCSW Janet Gilmore two weeks later, much of Plaintiff's "discussion was delusional in nature." (R. 556). His mood was frustrated, and his judgment and insight were considered to be poor. (R. 557). By the time of his next appointment with Dr. Khan on December 11, 2013, though, Plaintiff's condition appeared to have improved somewhat, as he denied experiencing any of the symptoms he had exhibited in November and appeared to be getting along better with his family. (R. 545).

Plaintiff was seen by LCSW Gilmore for a therapy session on December 24, 2013. (R. 543). He reported that he was "miserable" and seemed irritable and paranoid, particularly about his family. (R. 543). He also admitted to some suicidal ideation, but he denied any intent or plan, and his insight and judgment were poor. (R. 543).

At his next session with LCSW Gilmore on January 8, 2014, Plaintiff reported feeling irritable and endorsed suicidal thoughts, but he denied any intent to act on them. (R. 540). He also seemed to have psychotic symptoms, "i.e. the referential thinking as described," and he "also at times says his body seems to be distorted, especially his hands." (R. 540).

The following day, Plaintiff voluntarily went to the diagnostic evaluation center at Western Psych after an argument with his mother, during which he flushed his medicine down the toilet. (R. 538). He reported that he had not been consistent in taking his medications; however, he denied suicidal/homicidal ideation and psychosis. (R. 538).

On January 15, 2014, Plaintiff had a follow-up with Dr. Khan, at which time he reported that he had been having a hard time with his family. (R. 527). He denied hallucinations,

suspicious thoughts, and suicidal/homicidal ideation. (R. 527). Although Plaintiff also initially denied any substance use, he later admitted to having smoked marijuana the day before his appointment. (R. 536). As Dr. Khan noted, Plaintiff was "still vague regarding how often [he used marijuana] and how much" he used. (R. 527). Plaintiff did, however, say that using marijuana made him "lose motivation." (R. 527). After learning this, Dr. Khan once again advised Plaintiff about the effect his marijuana use might have on his psychotic symptoms. (R. 535). Plaintiff's mental status examination, moreover, was normal, and Dr. Khan assessed a GAF of 55. (R. 534-35).

Plaintiff continued receiving regular treatment through the STEP program at Western Psych between February 2014 and May 2014 (the last month for which records are available). In March, Dr. Khan noted that Plaintiff's condition appeared to have improved since his dosage of Risperdal was increased from 5 mg back to 6 mg. (R. 718). However, Plaintiff continued to use marijuana, and he was again advised "how this maybe affecting his symptoms and he appeared to understand." (R. 718). In April, Plaintiff told Dr. Khan that he felt "things [were] going really well," as he had "been compliant with [his] medications and like[d] the dose where it [was]." (R. 683). He denied hallucinations and paranoia, along with marijuana use, and also noted that he had an upcoming job interview. (R. 683).

Just two weeks later, however, Plaintiff underwent interview for the ESSENCE Program[2] at Western Psych, and he reported experiencing auditory hallucinations, visual hallucinations, thought insertion, and withdrawal. (R. 680). In addition, he reported difficulty with concentration

2.      "The ESSENCE Program is a treatment study for people diagnosed with schizophrenia, schizoaffective or schizophreniform disorder. Participants will be treated for up to 18 months with either Cognitive Enhancement Therapy or Enriched Supportive Therapy, both of which have been shown to help people with schizophrenia." *ESSENCE Program*, The Univ. of Pittsburgh, http://www.ascend.pitt.edu/essence/ (last visited February 17, 2016).

and memory. (R. 680). Plaintiff also admitted to continued marijuana use, though he was inconsistent as to how frequently he used. (R. 680).

On May 14, 2014, Plaintiff had a session with LCSW Gilmore, and the focus of which was Plaintiff's recent calls to the re:solve Crisis Network wherein he talked about obtaining a gun. (R. 676). He told LCSW Gilmore that he did not intend to harm anyone but used this as a way to express his frustrations. (R. 676). Plaintiff continued to believe that his family members were attempting to control him. (R. 676). He also said that he continued to smoke marijuana. (R. 676).

During a meeting with a crisis clinician at Western Psych on May 16, 2014, Plaintiff exhibited disorganized speech and behavior. (R. 675). He smiled inappropriately throughout the assessment and spoke about how his family was bothering him, explaining that he could "feel them in his eye, which he state[d] [was] a metaphor." (R. 675). He also said that he believed is mother could control people's minds. (R. 675).

At his May 28, 2014, session with LCSW Gilmore, Plaintiff reported that he felt fine, but "he smile[d] inappropriately and much of his conversation [was] tangential." (R. 671). He also exhibited delusions regarding his family. (R. 671). Moreover, although he endorsed continued marijuana use, he said that he was attempting to use less frequently. (R. 671).

B.      The ALJ's Decision

Since Plaintiff was under 18 years old when he filed his application, the ALJ assessed whether he was disabled under both the standard for childhood disability and the standard for adult disability. With respect to the childhood disability standard, the ALJ concluded that Plaintiff had less than marked limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, and in the ability to care for himself; and

no limitation in moving about and manipulating objects and in health and physical well-being. Thus, the concluded that Plaintiff was not disabled prior to attaining age 18. (R. 33).

With regard to the adult disability claim, the ALJ concluded at step 3 of the sequential evaluation that Plaintiff does not have an impairment or combination of impairments that meets or equals any of the listings. Accordingly, the ALJ proceeded to assess Plaintiff's residual functional capacity ("RFC"). After recounting his view of the evidence, the ALJ concluded that Plaintiff retained the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can perform only simple, routine, repetitive tasks and short, simple instructions in a stable, low stress environment, involving few changes in the routine work setting." (R. 34). "Additionally," the ALJ explained, "he can have only occasional contact with coworkers and supervisors, and he cannot perform work involving close coordination with coworkers, such as teamwork. Further, he can have no more than occasional contact with the general public." (R. 35). "Finally," the ALJ concluded, "he cannot work at an assembly line rate pace." (R. 35). Then, considering Plaintiff's age, education, work experience, RFC, and the testimony of the VE, the ALJ held that Plaintiff was not disabled within the meaning of the Act after he turned 18.

## III.    Legal Analysis

### A.    Standard of Review

When reviewing the final decision of the Social Security Administration, "[t]his Court neither undertakes a de novo review of the decision, nor does it re-weigh the evidence in the record." *Thomas v. Massanari*, 28 F. App'x 146, 147 (3d Cir. 2002) (citing 42 U.S.C. § 405(g)). Instead, this Court's "review of the Commissioner's final decision is limited to determining whether that decision is supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358,

360 (3d Cir. 1999). If the decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971). It consists of more than a scintilla but less than a preponderance of the evidence. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798 (3d Cir. 2010). Importantly, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).

**B.    Discussion**

Plaintiff advances three arguments as to why this case should be remanded to the ALJ. First, he argues that the ALJ improperly relied on the "moot and stale" opinions from Dr. Perconte, the state agency's consultative examiner, and Melissia Diorio, Psy.D., the state agency's non-examining psychologist. According to Plaintiff, by the time the ALJ issued his opinion, these medical opinions no longer constituted substantial evidence because there was a "significant decline" in Plaintiff's mental health after they were rendered. Second, Plaintiff argues that the ALJ failed to give "good reasons" for ostensibly rejecting the opinions in Dr. Khan's January 27, 2014, report. And third, Plaintiff argues that the ALJ improperly speculated about the effects of his marijuana use on his symptoms and made a number of factual errors, which resulted in a decision that is not supported by substantial evidence.

The Court will begin by addressing whether the ALJ complied with the "treating physician rule," as Plaintiff's other arguments flow from this one. As the Third Circuit Court of Appeals has explained:

> An ALJ should give "treating physicians' reports great weight, 'especially when their opinions reflect expert judgment based on a continuing observation of the

> patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d
> 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.
> 1999)). While contradictory medical evidence is required for an ALJ to reject a
> treating physician's opinion outright, such an opinion may be afforded "more or
> less weight depending upon the extent to which supporting explanations are
> provided." *Plummer*, 186 F.3d at 429.

*Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008). Even when a treating

physician's opinion is not entitled to controlling weight, it still must be assessed in accordance

with "the factors provided in 20 CFR 404.1527 and 416.927." SSR 96–2p, 1996 WL 374188, at

*4 (July 2, 1996). "In many cases, [it] will be entitled to the greatest weight and should be

adopted, even if it does not meet the test for controlling weight." *Id.* If a treating physician's

opinion conflicts with other evidence in the record, the ALJ may decide which evidence to

credit, but he "'cannot reject evidence for no reason or for the wrong reason.'" *Morales*, 225

F.3d at 318 (quoting *Plummer*, 186 F.3d at 429). Furthermore, "[i]n choosing to reject the

treating physician's assessment, an ALJ may not make 'speculative inferences from medical

reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory

medical evidence' and not due to his or her own credibility judgments, speculation or lay

opinion." *Id.* (quoting *Plummer*, 186 F.3d at 429). "The principle that an ALJ should not

substitute his lay opinion for the medical opinion of experts is especially profound in a case

involving a mental disability." *Id.* at 319.

Dr. Khan, who had treated Plaintiff consistently since 2012, clearly considered him to be

disabled and unable to work. According to Dr. Khan's January 27, 2014, assessment, Plaintiff

had trouble focusing, memory problems, symptoms of psychosis, low mood, trouble sleeping,

and appeared sedated. (R. 665). In a check-box form accompanying the assessment, Dr. Khan

opined that Plaintiff would be unable to meet competitive standards remembering work-like

procedures, maintaining attention for a two-hour segment, working in coordination or proximity

to others without being unduly distracted, competing a workday or workweek without interruptions from his psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and dealing with normal work stress. (R. 667). Furthermore, Dr. Khan opined, Plaintiff was seriously limited in his ability to understand, remember, and carry out very short and simple instructions; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; make simple, work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; and be aware of normal hazards and take appropriate precautions. (R. 667). Although Dr. Khan noted that Plaintiff's condition would improve somewhat if he stopped using marijuana, he still felt that he would be unable to perform full-time work. (R. 669).

The ALJ considered Dr. Khan's assessment, but he decided to give it "less than controlling weight." (R. 37). The ALJ was within his authority to decline to give any "special significance" to those portions of Dr. Khan's assessment that touched on issues reserved for the Commissioner, such as whether Plaintiff could perform "full-time competitive employment on a sustained basis." SSR 96-5P, 1996 WL 374183, at *5 (S.S.A. July 2, 1996). But not all of Dr. Khan's opinions veered into that territory, and as Plaintiff argues, the ALJ's reasons for outright discounting the remaining portions of Dr. Khan's assessment were flawed.

The ALJ initially declined to accord controlling weight to Dr. Khan's assessments because he found them to be inconsistent with the Dr. Khan's own treatment records. According to the ALJ, "[r]ather than indicating disabling symptoms lasting for at least 12 consecutive

months . . . [Dr. Khan's treatment records] indicate exacerbations that even Dr. Khan suspect[ed]" were "related to a decrease in [Plaintiff's] medications, which may have then led to increases in [Plaintiff's] marijuana usage." (R. 37).

The problem with this finding is twofold. First of all, because the ALJ did not cite to specific portions of the record, it is not clear which "exacerbations" he is referring to. To be sure, Plaintiff's condition did appear to fluctuate with changes in his medication. On at least two occasions, Plaintiff stopped taking his medication as prescribed, which triggered a deterioration in his condition and led his family to petition for his involuntary commitment: first, in December 2012 and, second, in August 2013.[3] Then a few months later, in October 2013, Plaintiff's condition deteriorated after Dr. Khan decreased his oral dosage of Risperdal. Nowhere in the record, however, does Dr. Khan say that decreases in Plaintiff's medications "led to increases in [his] marijuana usage," as the ALJ claimed.

More to the point, though, even accepting that Plaintiff's condition improved when he took his medications (as one would expect), that does not mean that he was totally symptom-free and capable of working when he was properly medicated, as the ALJ's decision seems to

---

3.      Plaintiff argues that the ALJ ignored that his non-compliance with his medication was, itself, a symptom of his psychotic disorder. Therefore, Plaintiff argues, it was improper for the ALJ to use Plaintiff's non-compliance against him when finding that he wasn't disabled. Some "Federal Courts have recognized anosognosia as a potential condition of schizophrenia and bipolar disorder." *Martin v. Colvin*, No. 4:11-CV-02378, 2014 WL 1235664, at *11 (M.D. Pa. Mar. 25, 2014) (citations omitted). "Other Federal Courts, while not utilizing the term anosognosia, have noted that noncompliance with prescribed medication can be a medically-determinable symptom of mental illness." *Id.* (citations omitted). In this case, however, "[t]here is no medical opinion or indication in any of the medical records that [Plaintiff's] failure to comply with his prescriptions was a result or symptom of his illness." *Id.* By asking this Court to recognize that his non-compliance with his medication was definitely a result of his mental illness, Plaintiff is inviting the same sort of speculation that he faults the ALJ for engaging in. The Court is unwilling to do so. However, on remand, Plaintiff is free to attempt to pursue this line of inquiry, and the ALJ, of course, is also free to develop evidence on this issue if he sees a need to do so.

suggest. As the Third Circuit Court of Appeals has explained, "the work environment is completely different from a home or a mental health clinic[,]" so a doctor's observation that a patient "is 'stable and well controlled with medication' during treatment does not support a medical conclusion that [the patient] can return to work." *Morales*, 225 F.3d at 319. For the same reasons, a doctor's assessment of a patient during an examination does not necessarily contradict a seemingly more restrictive statement about the patient's "ability to function in a work setting." *Brownawell*, 554 F.3d at 356. The Court of Appeals has expressly "admonished ALJs who have used such reasoning, noting the distinction between a doctor's notes for purposes of treatment and that doctor's ultimate opinion on the claimant's ability to work." *Id.* (citing *Morales*, 225 F.3d at 319).

The ALJ ignored this distinction. Even though Dr. Khan remarked at times that Plaintiff was doing well on his medications, he nonetheless opined that Plaintiff had marked limitations in a number of areas of work-related functioning and had shown only "minor improvements" since he began receiving treatment in November 2012. (R. 665). Other evidence in the record related to periods when Plaintiff was taking his medications – which the ALJ completely glossed over – supported Dr. Khan's assessments. For example, at a therapy session in late November 2013, LCSW Gilmore noted that much of Plaintiff's "discussion was delusional in nature;" his mood was frustrated, and his judgment, and insight were considered to be poor. (R. 556, 557). Although Plaintiff showed some improvement at his next session, by December 24, 2013, he reported that he was "miserable" and seemed irritable and paranoid. (R. 543). He also admitted to some suicidal ideation. (R. 543). Likewise, on January 8, 2014, Plaintiff exhibited suicidal ideation and psychotic symptoms. (R. 540). LCSW Gilmore made similar observations during her two sessions with Plaintiff in May 2014, the last month for which records are available, as

she noted that Plaintiff continued to display erratic and delusional behavior. (R. 671, 676). Thus, Dr. Khan's opinion should not have been "supplanted by an inference gleaned from treatment records reporting on [Plaintiff] in an environment absent the stresses that accompany the work setting." *Morales*, 225 F.3d at 319.

As to the ALJ's second reason for rejecting Dr. Khan's opinion, the fact that Dr. Khan assessed Plaintiff with a GAF score "of 55, while relevant, does not contradict [Dr. Khan's] ultimate finding that [Plaintiff] was disabled and unable to work because a GAF score 'does not have a direct correlation to the severity of the requirements in [the SSA's] disorder listings.'" *Daniel v. Astrue*, No. 10-CV-5397 NGG, 2012 WL 3537019, at *10 (E.D.N.Y. Aug. 14, 2012) (quoting *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injuries*, 65 Fed. Reg. 50746, 50764–5 (2000)). "[S]tanding alone, a GAF score, which can reflect social and/or occupational functioning, does not necessarily evidence whether an impairment seriously interferes with a claimant's ability to work." *Price v. Colvin*, No. 13-1055-SAC, 2014 WL 1246762, at *7 (D. Kan. Mar. 26, 2014). "Because a GAF score may not relate to a claimant's ability to work, the score, standing alone, without further explanation, does not establish whether or not plaintiff's impairment severely interferes with an ability to perform basic work activities." *Id.* The ALJ erred by finding otherwise.

The ALJ's third reason for rejecting Dr. Khan's opinion – that it was not supported by "medically acceptable clinical and laboratory diagnostic techniques" – is similarly misguided. As Plaintiff argues, there are no lab tests to specifically diagnose psychotic disorders like schizophrenia and schizoaffective disorder; instead, a diagnosis "'rests on historical information and a careful mental status examination.'" *See Johnson v. Astrue*, 493 F. Supp. 2d 652, 661 (W.D.N.Y. 2007) (quoting *Textbook of Psychiatry*, Ch. 9 (Hales ed., 2002)). Since 2011, Dr.

Khan and other mental health professionals consistently diagnosed Plaintiff with a type of psychotic disorder and recorded various signs and symptoms indicative of the disorder. Not one medical professional called this diagnosis into question, and neither the ALJ nor this Court has any basis to conclude that the techniques these professionals used to make their diagnoses were not "medically acceptable." Moreover, Dr. Khan's "treatment of Plaintiff, utilizing anti-psychotic medication and therapy, was consistent with the usual treatment of a person with such condition." *Blades v. Astrue*, No. 3:09-CV-430-J-34MCR, 2010 WL 3490215, at *12 (M.D. Fla. Aug. 5, 2010). Accordingly, the purported lack of "medically acceptable clinical and laboratory diagnostic techniques" was not a proper basis to reject Dr. Khan's assessments.

Equally problematic is the ALJ's decision to assign "great weight to Dr. Perconte's assessments of no worse than moderate symptoms," and "significant weight" to the assessments of the non-examining state agency psychologist, Dr. Diorio, which adopted Dr. Perconte's findings. The Court does not necessarily agree with Plaintiff that these opinions were "stale and moot" by the time the ALJ rendered his decision and thus could not be relied upon. As the Third Circuit Court of Appeals has recognized, "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision[,]" and "[t]he Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).

Be that as it may, the ALJ erred in concluding that these opinions were "consistent with the overall medical evidence of record." (R. 37). Plaintiff was diagnosed with schizoaffective disorder while he was receiving treatment at the Bradley Center in early 2012 and that diagnosis was consistently confirmed by other doctors and mental health professionals in the years that

followed. As was noted during Plaintiff's initial evaluation at Mercy Behavioral Health, Plaintiff's psychotic symptoms were initially "thought to be associated with abuse of marijuana and alcohol." (R. 338). While Plaintiff was at Bradley Center, though, Plaintiff's doctors found that not to be the case, "as anti-psychotic medication stabilized his mood and behavior" and improved his "thought processes." (R. 338). Nonetheless, Dr. Perconte clearly attributed Plaintiff's psychotic symptoms *solely* to his marijuana use when he examined him in October 2012. In fact, he opined that "[Plaintiff] would show no other psychiatric symptoms or problem other than those related to his personality disorder in the absence of drug or alcohol use." (R. 430). He also opined that, although "[Plaintiff] continue[d] to use cannabis daily," he did not display any "symptoms of depression and no behavioral disturbance other than those related to his history of criminal behavior." (R. 430). As already explained, the medical records post-dating Dr. Perconte's evaluation clearly belie these observations, as Plaintiff did display symptoms of depression and psychosis, as recently as May 2014, and was consistently diagnosed with psychotic disorder. Moreover, although Dr. Khan noted on numerous occasions that Plaintiff's marijuana use may have been exacerbating his psychotic symptoms, he nevertheless continued to diagnose Plaintiff with psychotic disorder and concluded that Plaintiff would still be unable to work even if he quit using marijuana. (R. 669). The ALJ erred assigning too much weight to Dr. Perconte's one-time assessment, which was not, as the ALJ found, entirely consistent with the evidence of record. *See Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994) ("In considering a claim for disability benefits, greater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant.").

The ALJ's errors in evaluating the opinion evidence, by themselves, require the Court to remand this case to the ALJ for further proceedings. However, it also bears mentioning that the

ALJ made a number of factual errors that call his decision into question.

As Plaintiff points out, when determining whether Plaintiff met the childhood disability standard, the ALJ noted that Plaintiff's condition had improved on Risperdal. However, Plaintiff was not prescribed Risperdal until August 2013, after he had turned 18. Thus, this was totally irrelevant to whether Plaintiff was disabled before that time.

Furthermore, the ALJ claimed that Plaintiff's August 2013 hospitalization "coincided with a decrease of [his] oral Risperidone . . . and [Plaintiff] reportedly appeared to improve again following an increase of his medication along with the continuing of his injections." (R. 36). This is incorrect. Plaintiff was not taking Risperdal prior to his hospitalization; he was only on Zyprexa and Prozac. The records cited by the ALJ actually refer to October and November 2013, when Dr. Khan reduced Plaintiff's dosage of oral Risperdal and Plaintiff appeared to decompensate, which prompted Dr. Khan to return Plaintiff's dosage to its original level.

By the same token, the ALJ asserted that "[c]ontinuing treatment records with [Western Psych] show an exacerbation of symptoms of auditory hallucinations and paranoia when [Plaintiff] is using marijuana, especially in 2013, and [Plaintiff] admits that he still uses marijuana intermittently, about 2-3 times a week, with only days or weeks of sobriety." (R. 36). This statement skews the evidence. As already discussed, Dr. Khan did note several times in his treatment records that Plaintiff's marijuana use "maybe affecting his symptoms." (R. 718). Contrary to what the ALJ seemed to suggest, though, Dr. Khan never confirmed the connection between Plaintiff's symptoms and his marijuana usage, and he clearly did not think that Plaintiff would be symptom-free if he stopped using marijuana. He said as much in his January 2014 assessment.

Finally, the ALJ noted that Plaintiff "dropped out of [CCAC in 2013] with failing grades,

while also using marijuana at the time." (R. 36). The clear implication is that Plaintiff's marijuana use was the reason he dropped out, but that is pure speculation on the ALJ's part. Plaintiff testified that he dropped out of CCAC because he "couldn't focus," (R. 74), and his grandmother testified that he dropped out because he was having problems with "[t]he reading, the focusing, just trying to . . . understand what was on in the book," (R. 75). Could Plaintiff's continued marijuana use have played a role in this? Of course. But there is nothing in the record to suggest that the symptoms of Plaintiff's mental illness did not, as well. It was inappropriate for the ALJ to assume otherwise.

## IV. Conclusion

Under the Social Security regulations, the Court has three options whenever it is reviewing a decision of the Commissioner that has denied benefits to a claimant. The Court can affirm the decision, reverse the decision and award benefits directly to a claimant, or remand the matter to the Commissioner for further consideration. 42 U.S.C. § 405(g) (sentence four). Following a review of all of the evidence of record and the ALJ's decision, the Court finds that the ALJ's decision must be remanded for further consideration. Specifically, the ALJ must re-assess the amount of weight to which Dr. Khan's January 27, 2014, assessment is entitled, vis-à-vis the earlier assessments of the consultative examiner, Dr. Perconte, and the state agency psychologist, Dr. Diorio. If the ALJ deems it necessary, it might also be reasonable to obtain an updated opinion on the state of Plaintiff's mental health and how it might impact his ability to work. While the Court is ordering a remand to assess the deficiencies discussed herein, the ALJ's decision may ultimately turn out to be correct, and nothing in this Memorandum Opinion should be taken to suggest that the Court has presently concluded otherwise.

For the reasons hereinabove stated, the Court will **GRANT** the Motion for Summary

Judgment filed by the Plaintiff insofar as it requests that the case be remanded to the ALJ for further consideration, and **DENY** the Motion for Summary Judgment filed by the Acting Commissioner. An appropriate Order follows.

McVerry, S.J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTUAN LENIERE JONES, JR.,  )
        **Plaintiff,**  )
  )
      **v.**  )  **2:15-cv-01169-TFM**
  )
CAROLYN W. COLVIN,  )
**Acting Commissioner of**  )
**Social Security,**  )
        **Defendant.**  )

## <u>ORDER</u>

**AND NOW**, this 25th day of February, 2016, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Plaintiff's MOTION FOR SUMMARY JUDGMENT (ECF No. 6) is **GRANTED**, and the Acting Commissioner's MOTION FOR SUMMARY JUDGMENT (ECF No. 15) is and **DENIED**. It is further **ORDERED** that this case is remanded to the ALJ for further proceedings in accordance with 42 U.S.C. § 405(g).

The Clerk shall docket this case **CLOSED**.

BY THE COURT:

s/ Terrence F. McVerry
Senior United States District Judge

cc:  **Kenneth R. Hiller**
     Email: khiller@kennethhiller.com

     **Paul Kovac**
     Email: paul.kovac@usdoj.gov

     (via CM/ECF)